**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| RACHEL SHAW, | : | Case No. 3:13-cv-210 |
| Plaintiff, | : | Judge Thomas M. Rose |
| v. | : | |
| CITY OF DAYTON, OHIO, | : | |
| and | : | |
| ALEX MAGILL, | : | |
| Defendants. | : | |

_____

**ENTRY AND ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT (DOC. 45)**

_____

This case is before the Court on the Motion for Summary Judgment (Doc. 45) filed by Defendants the City of Dayton, Ohio, and Alex Magill, a police officer with the Dayton Police Department. The material facts in this case are undisputed. On July 16, 2011, Officer Magill arrested Kylen English for attempted burglary and transported him to the Montgomery County jail. At the jail, while Officer Magill was processing a booking slip, English intentionally and repeatedly hit his head against a wall. As a result of the trauma to his head, jail medical staff would not permit English to be booked into the jail without a medical evaluation.

Officer Magill transported English to a nearby hospital, where he was evaluated and released. Officer Magill then placed English in the backseat of his police cruiser and began the trip back to the jail. As Officer Magill drove over a bridge, English, who was handcuffed, rose to his knees and pounded his head against the police cruiser's backseat window. Officer Magill pulled the cruiser to the curb to assess the situation as English shattered the window's glass.

While still handcuffed, English jumped out of the window, got to his feet, dove off the bridge. English fell approximately thirty feet onto a dry rock bed and later died from his injuries.

Plaintiff Rachel Shaw, Next of Kin and Administrator of the Estate of Kylen English, brought this action for damages against the City of Dayton and Officer Magill on June 27, 2013. (Doc. 2.)  Defendants move to dismiss Plaintiff's First Amended Complaint (Doc. 41), filed December 28, 2015, on the grounds that there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law.  (Doc. 45.)  Defendants' motion is fully briefed and ripe for the Court's review.  (Docs. 45, 52, 55.)  For the reasons discussed below, the Court **GRANTS** the Motion for Summary Judgment.

## I.     BACKGROUND

### A.  Officer Magill Arrests English for Attempted Burglary

In the evening of July 16, 2011, Donna Johnson called 911 and reported that Kylen English was kicking her door and trying to get into her apartment to get to her 16-year-old niece.  (Docs. 45-1, 45-2.)  Johnson provided a description of English to the 911 dispatcher and waited for the police to arrive.  (*Id.*)

Officer Magill was dispatched to Johnson's apartment on Yale Avenue in Dayton, Ohio on the report of a burglary in progress.  (Doc. 45-3, ¶ 8.)  Shortly thereafter, Officer Magill encountered English, patted him down, and asked him to take a seat in his police cruiser.  (*Id.*, ¶ 10-11.)  English complied and positively identified himself as Kylen English.  (*Id.*, ¶ 11.) English was not violent, and he did not exhibit any homicidal or suicidal tendencies.  (*Id.*, ¶ 12.)

Officer Magill returned to Yale Avenue with English in his cruiser.  (*Id.*, ¶ 13.)  Officer Magill talked to Johnson, who said that English had been trying to kick in her door and was upset

because she would not let him in to speak with her 16-year-old niece. (*Id.* at ¶ 14.) Johnson said that English had assaulted the niece in the past, so the family moved her to Johnson's house to prevent contact. (*Id.*) Johnson did not indicate that English was suicidal or likely to harm himself. (*Id.*, ¶ 15.) After speaking with Johnson, Officer Magill decided to take English to jail for attempted burglary. (*Id.*, ¶ 16.)

Officer Magill placed handcuffs on English and transported him to the jail without incident. (*Id.*, ¶ 17-18.) During the transport, English was not violent and did not exhibit any suicidal tendencies. (*Id.*, ¶ 19.) At the jail, Officer Magill secured his firearm and Taser in the trunk of his cruiser and told English to walk towards the outer receiving room door of the sally port. (*Id.*, ¶ 20.) Officer Magill was printing out English's booking slip when English intentionally struck the back of his head on the wall three to five times in rapid succession. (*Id.*, ¶ 21; Magill Depo. at 16-17.) Officer Magill ran over and attempted to stop English, who then fell to the floor. (Doc. 45-3, ¶ 21.) Officer Magill handed the booking slip and English's cell phone to Deputy Shiverdecker, so Officer Magill could use both hands to lift English to his feet. (*Id.*, ¶ 21; Doc. 47 at 17.)

Officer Magill escorted English into the inner receiving room where he was met by several correction officers and supervisors. (*Id.*, ¶ 23; Doc. 47 at 18.) The jail medical staff examined English and told Officer Magill that he would have to take English to the hospital for clearance before he could be booked at the jail. (*Id.*, ¶ 24; Doc. 47 at 19.) They were concerned about a potential head injury or involvement with drugs. (Doc. 45-3, ¶ 24.) The jail medical staff did not state English was suicidal. (*Id.*) The consensus was that English was trying to avoid going to jail. (*Id.*)

3

English was able to walk to the cruiser on his own and Officer Magill directed him to sit in the back of the cruiser. (*Id.*, ¶ 25.) Officer Magill retrieved his firearm and Taser from the trunk, and drove English to Grandview Medical Center ("Grandview"). (*Id.*, ¶ 25; Doc. 47 at 21.) Officer Magill also notified a supervisor, Sergeant John Riegel, who responded to the hospital to investigate whether English was injured. (Doc. 45-3, ¶ 26; Doc. 47 at 23.)

**B. Kylen English is Evaluated at Grandview Medical Center and Released**

At Grandview, English was evaluated by Dr. Christopher D. McIntosh. (Doc. 45-4, ¶ 3.) While being treated, English never stated that he had any intention of hurting himself or dying. (*Id.*, ¶ 5.) Nor did English make any statements about heaven, hell or end of life equivalents. (*Id.*, ¶ 6.) English told Dr. McIntosh that he did not want to go to jail, and that was his motivation for his behavior at the jail. (*Id.*, ¶ 7.) A CT scan performed on English came back negative and English was released from Grandview with no diagnosis that he was a threat to himself, and no special instructions for care regarding his mental state. (Docs. 45-3, ¶ 7, 45-4, 45-5; Doc. 47 at 27.) Officer Magill observed English after he was released from Grandview and he was not aggressive, nor did he show any signs that he would be a threat to himself. (Doc. 45-3, ¶ 28.)

**C. While Being Transported Back to Montgomery County Jail, English Breaks Out of Officer Magill's Police Cruiser and Commits Suicide**

Officer Magill activated the in-car cruiser camera/audio equipment and told English the camera was recording. (Doc. 45-3, ¶ 30; Doc. 47 at 30.) Grandview is less than two miles from the jail. (Doc. 45-3, ¶ 29.) Officer Magill did not fasten English's seatbelt because he was concerned about being vulnerable to injury or attack. (Doc. 45-3, ¶ 31.) While en route to the jail, English asked Officer Magill if people went to hell if they commit suicide. (Doc. 45-3, ¶ 32; Docs. 45-6, 45-7; Doc. 47 at 31.) Officer Magill replied, "it depends on what you believe in."

4

(Docs. 45-3, ¶ 32, 45-6.)

A few seconds later Officer Magill heard commotion from the backseat. (Doc. 45-3, ¶ 33.) Officer Magill asked, "hey partner, what are you doing?" (Doc. 45-3, ¶ 33; Doc. 45-7.) Officer Magill looked back and saw that English, while handcuffed, had maneuvered his body so that he was now kneeling and facing the rear passenger door. (Doc. 45-3, ¶ 34; Doc. 47 at 31.) Officer Magill immediately activated his overhead lights and began to navigate traffic to pull to the right side of the road. (Doc. 45-3, ¶ 35.) English hit his head two to four times on the window, and on the last hit English went out the window head first while the cruiser was still in motion. (Doc. 45-3, ¶ 36; Doc. 47 at 31.) Officer Magill stopped the cruiser and tried to capture English. (Doc. 45-3, ¶ 36.) Officer Magill made it to the rear of the cruiser just in time to see English get to his feet and jump over the railing of the bridge in a no-hands swan dive. (Doc. 45-3, ¶ 36; Doc. 47 at 39-40.) Officer Magill was unable to get close enough to stop English from diving off the bridge. (Doc. 45-3, ¶ 36; Doc. 47 at 39-40.) A citizen, Michael Tolliver, was traveling down Salem Avenue at the same time and witnessed the event. (Doc. 49 at 11.) He described the incident:

> I just turned on the bridge, seen the cop car coming toward me. Like I said, I didn't have any license. I was looking at the cop car. He made like a sudden veer over to the right lane, and he stopped in the middle of the street; and that's what grabbed my attention so, of course, I slowed down. And then I seen glass shatter out the right side of the car. And then a body came out the right side of the car, and the cop hopped – he jumped out of his car, with his door open. I can't remember if he ran around the front of the car or if he ran around the back of the car; but I know about the time he got to the passenger side of the car, Kylen had already jumped over. He wasn't even close to even grabbing him or stopping him.

(Doc. 49 at 11-12.)

English landed more than 30 feet below on a dry rock bed. (Doc. 45-3, ¶ 36.) Officer

5

Magill immediately called for medics and coordinated responding officers. (*Id.*, ¶ 37.) English died from his injuries. The Coroner determined that English's cause of death was "blunt force injury of chest and abdomen," and the manner of death was "suicide." (Doc. 45-8.)[1]

### D. The FBI Investigation into Kylen English's Death

The U.S. Department of Justice ("DOJ") conducted a comprehensive independent investigation of the events that resulted in English's death on July 16, 2011. (Docs. 45-13, 45-14.)[2] The DOJ reviewed all of the investigative materials generated by the Dayton Police Department and Montgomery County Sherriff's Office, and also independently interviewed the civilian witnesses who indicated they saw English escape from a patrol car on the Salem Avenue Bridge and then jump from the bridge voluntarily. (Docs. 45-13, 45-14.) After examination of all the evidence, the DOJ's Civil Rights Division, the U.S. Attorney's Office, and the FBI determined that the incident did not constitute a prosecutable violation of the federal criminal civil rights statutes. (Doc. 45-14.)

### E. The Dayton Police Department's Professional Standards Investigation

The Dayton Police Professional Standards Bureau ("Bureau") also conducted a comprehensive investigation of the events that resulted in English's death. (Doc. 45-9, ¶ 7, 10.) The Bureau concluded:

- Regarding the care Officer Magill provided for this prisoner, I find that his actions were justified, proper, and within the policies of the Dayton Police Department. Therefore, he is EXONERATED.

---

[1] The Court takes judicial notice of the Certificate of Death for Kylen English (Doc. 45-8) under Fed. R. Evid. 201.
[2] The Court takes judicial notice of the DOJ's press release titled, "Federal Officials Close the Investigation Into the Death of Kylen English" (Doc. 45-14) and DOJ's letter to City Manager Timothy H. Riordan on July 20, 2012, summarizing its investigation and findings regarding Mr. English's death (Doc. 45-13).

- Regarding the fact that Officer Magill did not buckle the seatbelt around Mr. English, I find that his actions were justified, proper, and within the policies of the Dayton Police Department. Therefore, he is EXONERATED.

(Doc. 45-9, ¶ 11.) In reaching these conclusions, the Bureau found that Officer Magill's statements about the events surrounding English's suicide were reliable and corroborated. (Doc. 45-9, ¶ 12; Doc. 45-10.) The Bureau found that Officer Magill did everything he could to keep English from escaping and committing suicide, but was not physically able to reach English in time to restrain him. (Doc. 45-9, ¶ 13; Doc. 45-10.)

The Bureau further concluded that no reasonable officer could have predicted English's suicide based, in part, on the following findings:

- There was no evidence that anyone involved in the burglary complaint gave the police information that English may want to harm himself;

- The fact that English hit his head against the wall inside the jail and said that he was "pissed off" and did not want to go to jail was no indication that he was suicidal;

- English was released from Grandview with no diagnosis that he was a threat to himself and no special instructions for care regarding his mental state; and

- The medical report indicated there was "no suicidality" upon examination.

(Doc. 45-9, ¶ 14; Doc. 45-10.)

Additionally, the Bureau concluded Officer Magill acted in a professional manner and did not violate Dayton Police policies or procedures in not seatbelting English in the backseat of his cruiser. (Doc. 45-9, ¶ 15-16; Doc. 45-10; Doc. 48 at 40-41.) The Bureau further found that English's suicide would not have been deterred if he had merely had a seatbelt on. (Doc. 45-9, ¶ 16.) The Bureau recognized that officers may be vulnerable to injury or attack when they fasten the seatbelts to their prisoners. (Doc. 45-9, ¶ 22; Doc. 45-10.) In order to buckle the prisoners in, the officers must place their unprotected face and upper body near the face of the prisoner while

using both hands to buckle the seatbelt. (*Id.*) This is contrary to officer safety tactics that have been taught for years. (*Id.*)

Furthermore, the Bureau concluded that seatbelts in cruisers are not intended to be prisoner restraints. (Doc. 45-9, ¶ 23; Doc. 45-10.) Prisoners commonly unbuckle their seatbelts even while handcuffed. (*Id.*) Therefore, a seatbelt would not, in and of itself, be a reasonable prisoner restraint and English's suicide would not have been deterred if he had merely been seatbelted. (*Id.*)

The Bureau recommended that no disciplinary action be taken against Officer Magill. (Doc. 45-9, ¶ 24; Doc. 45-10.) The Bureau's findings were approved by Richard Biehl, Director and Chief of Police, Lt. Colonel Robert Chabali, Assistant Chief of Police, and Major Mark Ecton, Chief of Staff. (Doc. 45-9, ¶ 25; Doc. 45-10.)

### F. Plaintiff's First Amended Complaint

Plaintiff Rachel Shaw, as Next of Kin and Personal Administrator to the Estate of Kylen English, filed her First Amended Complaint on December 28, 2015. (Doc. 41.) In the First Amended Complaint, Plaintiff asserts five causes of action against Defendants: (1) deprivation of constitutional rights and privileges under 42 U.S.C. § 1983 for failure to implement appropriate policies, customs, and practices (also known as a *Monell* claim, in reference to *Monell v. Dept. of Social Services*, 436 U.S. 658, 701 (1978)), (2) deprivation of constitutional rights and privileges under 42 U.S.C. § 1983 under the special relationship and state created danger doctrine (also known as a *Deshaney* claim, in reference to *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989)), (3) Ohio custodial negligence, (4) Ohio respondeat superior, and (5) Ohio survival action. (*Id.*) In response to Defendants' Motion for Summary Judgment, Plaintiff conceded that the facts do not support a *Monell* claim – her first alleged cause of action.

8

(Doc. 52 at 18.)   Plaintiff therefore abandoned that claim and does not object to its dismissal. (*Id.*)

## II.      SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."   *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson*, 477 U.S. at 250).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."   *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.   It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its

9

position.  *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255.  If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible.  10A *Wright & Miller, Federal Practice and Procedure*, § 2726.  Rather, credibility determinations must be left to the fact-finder.  *Id.*  However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment.  *Anderson*, 477 U.S. at 252.  "There must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.  *Id.*

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."  *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091 (1990).  Thus, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.  The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted.  Fed. R. Civ. P. 56(c).

## III.  ANALYSIS

### A.  Plaintiff's *DeShaney* Claim Under 42 U.S.C. § 1983

Having abandoned her *Monell* claim, Plaintiff's *DeShaney* claim is her only remaining federal claim.  For that claim, Plaintiff asserts two theories of liability under 42 U.S.C. § 1983. First, Plaintiff argues that Officer Magill "should have secured Mr. English in the available

10

seatbelt when they left Grandview Medical Center."   (Doc. 52 at 6.)   Second, Plaintiff argues that Officer Magill "should have moved Mr. English away from, not toward the edge of the bridge after Mr. English again began behaving abnormally and was talking about suicide."   (*Id.*)

"Section 1983 supplies a remedy against 'any person' who, acting under color of state law, deprives another person of rights protected by the Constitution; municipalities and other local government entities are considered 'persons' under § 1983." *Cutlip v. City of Toledo*, 488 F. App'x 107, 111 (6th Cir. 2012) (quoting 42 U.S.C. §1983.   However, the Supreme Court has held that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney*, 489 U.S. 189, 195 (1989).   As a result, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.   There are two exceptions to this general rule:   the custody exception and the state-created-danger exception. *Jahn v. Farnsworth*, 617 F. App'x 453, 462 (2015) (citing *Cutlip*, 488 F. App'x at 114).

The custody exception is premised on an affirmative act that exposes an individual to harm after being placed in a "special relationship" with the state, such as in an officer's custody. *Schneider v. Franklin County*, 288 F. App'x 247, 252 (6th Cir. 2008).   "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200.   The kinds of 'deprivation of liberty' that trigger the custody exception are 'incarceration, institutionalization, or other similar restraints.'" *Cutlip*, 488 F. App'x at 113 (quoting *DeShaney*, 489 U.S. at 200).

The state-created-danger exception consists of three elements:

11

(1)     An affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party;

(2)     A special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and

(3)     The state knew or should have known that its actions specifically endangered the plaintiff.

*Jahn v. Farnsworth*, 617 F. App'x 453, 463 (6th Cir. 2015) (quotations omitted).

Under either the custody exception or the state-created-danger exception, a plaintiff must show that the defendant acted with at least recklessness or deliberate indifference to establish liability. *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (mere negligence not sufficient to establish a due process violation under the Fourteenth Amendment); *Foy v. City of Berea*, 58 F.3d 227, 232 (6th Cir. 1995) ("Even in the cases involving injury to one prison inmate by another inmate, the plaintiff must demonstrate at least deliberate indifference to the injured party's needs in order to make out a substantive due process claim."); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1066 (6th Cir. 1994) ("Gross negligence is not actionable under § 1983, because it is not 'arbitrary in the constitutional sense.'").

## 1.  The Custody Exception

Defendants argue that they are entitled to summary judgment on Plaintiff's Section 1983 claim under the custody exception because English was not "in custody" at the time he injured and killed himself, and because Plaintiff cannot show that Officer Magill was deliberately indifferent to English's safety.  (Doc. 45 at 15.)  Defendants also argue that Officer Magill's failure to seatbelt English in the backseat of his cruiser does not constitute an affirmative act on which Plaintiff may premise a due process violation and that there is no causal connection between that failure and English's suicide.  (*Id.*)  As the Court finds that Plaintiff cannot establish that Officer

12

Magill was deliberately indifferent to Plaintiff's health or safety, it does not consider Defendants' other arguments.

Deliberate indifference is more than negligence or carelessness, and is the equivalent of recklessly disregarding a known risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001), the Sixth Circuit elaborated on the deliberate indifference standard:

> Deliberate indifference is not mere negligence. Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to Watkins's health and safety. *Farmer v. Brennan*, 511 U.S. 825, 835–37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This standard is subjective. It is not enough that there was a danger of which an officer should objectively have been aware. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970. If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments. *Id.* at 837–38, 114 S.Ct. 1970.

*Id.* at 686.

Here, the undisputed facts cannot establish that Officer Magill knew of a substantial risk to English's safety and then was deliberately indifferent to that risk. As Defendants note in their opening memorandum, courts have consistently held that the failure to seatbelt an inmate does not violate the Constitution. *See Oliver v. Ga. Dep't of Corr.*, 2006 U.S. Dist. LEXIS 78585 (M.D. Ga. Oct. 27, 2006) (holding the "failure to seatbelt an inmate does not violate the constitution"); *Bird v. Chatham County Det. Ctr.*, 2007 U.S. Dist. LEXIS 99541 (S.D. Ga. Nov. 14, 2007) (holding same); *Smith v. Sec'y for the Dep't of Corrections*, 252 F. Appx 301, 304 (11th Cir. 2007) (failure to fasten inmate's seatbelt in converted utility van does not constitute a substantial risk of serious harm); *Dexter v. Ford Motor Co.*, 92 F. Appx 637, 643 (10th Cir. 2004) (holding that "failure to seatbelt an inmate does not violate the Constitution"); *Spencer v. Knapheide Truck*

13

*Equip. Co.*, 183 F.3d 902, 906 (8th Cir. 1999) (failure to provide seatbelts or other safety restraints in patrol wagon did not constitute policy that presented a substantial risk of serious harm); *Walls v. Kaho*, 2009 U.S. Dist. LEXIS 27840 (S.D. Miss. Mar. 31, 2009) ("Many courts . . . have held that there is no constitutional right of a prisoner to the use of a seatbelt while being transported, and that while failure to seatbelt a prisoner may give rise to a claim for negligence, it does not give rise to a cognizable constitutional claim."): *Ingram v. Herrington*, 2007 U.S. Dist. LEXIS 71781 (W.D. Ky. Sep. 26, 2007) (holding that "the weight of authority from other circuits requires a finding that no Eighth Amendment violation occurs simply by transporting a prisoner unseatbelted in a prison vehicle," even where the plaintiff alleges that the driver exceeded the speed limit); *Young v. Hightower*, 2007 U.S. Dist. LEXIS 54507 (E.D. Mich. Jul. 27, 2007) ("[N]o Eighth Amendment violation occurs simply by transporting a prisoner unseatbelted in a prison vehicle."); *Mojet v. Transport Driver*, 2006 U.S. Dist. LEXIS 85412 (N.D. Ind. Nov. 22, 2006) ("Transporting inmates in vans without seat belts does not meet the deliberate indifference standard."); *Williams v. City of New York*, 2005 U.S. Dist. LEXIS 26143 (S.D.N.Y. Nov. 1, 2005) (failure to provide seatbelts on prison transport van does not constitute a constitutional violation).

Thus, Officer Magill's mere failure to seatbelt English—consistent with the policy of the Dayton Police Department—could not amount to knowingly subjecting English to a substantial risk of serious harm. Even when coupled with the facts regarding English's behavior prior to and during his transport to the jail, Officer Magill could not have known that placing English in handcuffs in the backseat of his cruiser might subject English to a substantial risk or serious harm, much less to a risk that he might take his own life. At the hospital, English was treated and cleared for booking into the jail, without any special instructions concerning his mental health.

The earliest that Officer Magill might have become aware that English posed a threat to himself was after English asked him about suicide and began pounding his head against the cruiser's backseat window.   No juror could find that Officer Magill's response to those events, however, was deliberately indifferent.   Officer Magill promptly pulled the cruiser over to the side of the road to assess the situation and exited the cruiser immediately after he reached a stop.   (Doc. 45-7 (dashcam video from Officer Magill's cruiser).)   Officer Magill was unable to reach English before he jumped off the bridge, but immediately called for medical assistance.   (*Id.*)

Plaintiff's argument that Officer Magill acted with deliberate indifference by pulling over to the sidewalk, instead of stopping in the middle lane of the bridge, fails to create an issue of fact precluding summary judgment.   Plaintiff argues that, in light of English's self-inflicted head trauma and question about suicide, the middle lane would have been safer because English would have had to travel farther to attempt suicide, giving Officer Magill a better chance of intercepting him.   First, even after English asked about suicide, there are insufficient facts to establish that Officer Magill knew that there was a substantial risk that English, still handcuffed in the backseat, might attempt to take his own life by jumping out of the cruiser's window and then jumping off the bridge.   Plaintiff's argument also disregards the substantial risk of bodily harm to both Officer Magill and English if the cruiser were stopped in the middle lane.   Unlike the risk that English might jump off the bridge, the risk that Officer Magill or English might be injured by a passing vehicle was both known and substantial.

Defendants are entitled to summary judgment on Plaintiff's section 1983 claim under the custody exception.

### 2.  The State-Created-Danger Exception

15

Defendants argue that Plaintiff's section 1983 claim under the state-created-danger exception fails because Officer Magill's alleged failure to act, even if proven, does not constitute an affirmative action upon which liability may be premised.  (Doc. 45 at 11.)  Defendants also argue that Officer Magill did not know, nor should he have known, that English would take his own life; Plaintiff therefore cannot satisfy the third prong of the state-created-danger exception. (Doc. 45 at 12-13.)

Defendants are entitled to summary judgment on Plaintiff's claim under the state-created-danger exception because Plaintiff cannot establish an affirmative act by Officer Magill or the requisite mental state.   Plaintiff argues that Officer Magill's affirmative acts were failing to seatbelt English and pulling over to the side of the road when crossing the bridge. Neither of these acts satisfies the affirmative act requirement.   Officer Magill's failure to seatbelt English does not constitute an affirmative act under the governing caselaw.   *DeShaney*, 489 U.S. at 197; *Patterson v. City of Detroit*, 2008 U.S. Dist. LEXIS 95771 (E.D. Mich.); *Jones v. Reynolds*, 438 F.3d 685, 691 (6th Cir. 2006); *Schroder v. City of Fort Thomas*, 412 F.3d 724, 728-29 (6th Cir. 2005); *Weeks v. Portage County Executive Offices*, 235 F.3d 275 (6th Cir. 2000); *Vidovic v. Mentor City Sch. Dist.*, 921 F. Supp. 2d 775, 792 (N.D. Ohio 2013)).   The act of pulling the cruiser over does not meet the affirmative act requirement because it neither created nor increased the risk that English would be exposed to an act of violence.   *Jahn*, 617 F. App'x at 463.   English committed an act of violence on himself.   English could have accomplished the same end, although perhaps by different means, if Officer Magill had stopped his cruiser in the middle lane instead of pulling over.

For the same reasons that Plaintiff cannot show deliberate indifference under the custody

exception, Plaintiff cannot show that Officer Magill knew, or should have known, that there was a substantial risk that English would attempt suicide. Defendants are entitled to summary judgment on Plaintiff's section 1983 claim under the state-created-danger exception.

### 3. Officer's Magill's Entitlement to Qualified Immunity

In addition to the above grounds for dismissal of Plaintiff's section 1983 claim, Officer Magill is entitled to summary judgment on that claim on qualified immunity grounds. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).

Here Plaintiff cannot demonstrate that Officer Magill's conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231. As explained by the Supreme Court, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." *Anderson v. Creighton*, 483 U.S.

17

635, 640 (1987).   The Supreme Court continued:  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.*   The relevant question is therefore whether a reasonable officer could have believed that his or her actions were lawful.   *Id.* at 641.   "If officers of reasonable competence could disagree on this issue, immunity should be recognized."   *Malley v. Briggs*, 475 U.S. 335, 341 (1986).   "Although qualified immunity is an affirmative defense, the ultimate burden is on the plaintiff to show that the defendant is not entitled to qualified immunity."   *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1992).

The Sixth Circuit has never found liability under the state-created-danger doctrine where the victim committed suicide.  *See Cutlip*, 488 F. App'x at 115; *Jahn*, 617 F. App'x at 463. While this case is not identical to the cases involving suicide that have been before the Sixth Circuit, the facts are not distinguishable in a way that would have put Officer Magill on notice that any of his actions were unlawful.   To the contrary, based on the sequence of events in this case, a reasonable officer in the same position as Officer Magill would have believed that his or her actions were lawful.   The Tenth Circuit case cited by Plaintiff, *Armijo v. Wagon Mound Pub. Schools*, 159 F.3d 1253 (10th Cir. 1998), is readily distinguishable from this case and therefore did not clearly establish that any of Officer Magill's conduct was unlawful.     In sum, Officer Magill is entitled to qualified immunity on Plaintiff's section 1983 claim, and that provides an additional ground for dismissal of that claim against him.

### B.  Plaintiff's Claims Under Ohio Law

The City of Dayton and Officer Magill are immune from liability for Plaintiff's Ohio law

18

claims under Ohio Revised Code §§ 2744.02(A)(1) and 2744.03(A)(6), respectively.

### 1. The City of Dayton's Immunity Under Ohio Rev. Code § 2744.02(A)(1)

The Political Subdivision Tort Liability Act, Ohio Revised Code Chapter 2744, "is intended to offer political subdivisions a general grant of immunity from tort liability under most circumstances." *Smith v. Minnick*, 68 Ohio App. 3d 619, 622 (1990).[3] Under the Act, subject to five specifically enumerated exceptions, "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." Ohio Rev. Code § 2744.02(A)(1). A "governmental function" explicitly includes the "provision or nonprovision of police." Ohio Rev. Code § 2744.01(C)(2)(a); *see also McCloud v. Nimmer*, 72 Ohio App. 3d 533, 538 (8th Dist. 1991) ("[I]t is firmly established that the operation of a police department is a governmental function."); *Sharma v. Hummer*, 2000 Ohio Misc. LEXIS 55 at *33-34 (Wood Cty. Common Pls. May 5, 2000) (granting city and its police department immunity under § 2744.02(A)(1) on claims for negligent hiring and supervision). As all of Plaintiff's state law claims are based on allegations regarding the operation of police services, the City of Dayton is immune from liability on those claims unless an exception applies.

The five exceptions under which the City of Dayton could still be found liable apply to "injury, death, or loss to person or property" caused by (1) negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority; (2) negligent performance of acts by their employees with respect to proprietary

---

[3] "Political subdivision" means a municipal corporation, township, county, school district, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state. Ohio Rev. Code § 2744.01(F).

functions of the political subdivisions; (3) negligent failure to keep public roads in repair and free

of obstructions; (4) negligent maintenance of physical defects within or on the grounds of

governmental buildings; and (5) whenever liability is expressly imposed on political subdivisions

by a section of the Revised Code.  Ohio Rev. Code § 2744.02(B)(1)-(5).  If none of these

exceptions apply, the City of Dayton retains its immunity.  *Burgess v. John Doe*, 116 Ohio App.

3d 61, 63 (1996).

Plaintiff argues that the City of Dayton can be found liable under the first exception, which

applies to the negligent operation of a motor vehicle.  (Doc. 52 at 16-17.)  Defendants assert,

however, that this exception must be read narrowly to apply "only to negligence in driving or

otherwise causing the vehicle to be moved."  (Doc. 45 at 23 (quoting *Doe v. Marlington Local

Sch. Dist. Bd. of Educ.*, 122 Ohio St. 3d 12, 18 (2009)).)  Defendants are correct that, as construed

by the Supreme Court of Ohio, the conduct alleged in this case does not fall within the definition of

operation of a motor vehicle.

Here, Officer Magill is alleged to have failed to seatbelt English and to have pulled over his

cruiser at a location that subjected English to greater risk of injury.  In *Marlington*, the Supreme

Court of Ohio noted that operation of a motor vehicle under § 2744.02(B)(1) has been construed

specifically to exclude the supervision of passengers.  *Marlington*, 122 Ohio St. 3d at 18 (noting

that "while [passenger] management may well be part of the driver's responsibility, it is a

responsibility separate and distinct from that of the operation of the motor vehicle").  The failure

to seatbelt English falls squarely within the supervision of passengers, and therefore cannot give

rise to liability.

Officer Magill's decision to pull over on the side of the road relates to the operation of his

cruiser, but it does not amount to negligent operation and cannot be reasonably said to have caused English's death. Defendants' argument that this case is factually and legally similar to *Pakdimounivong v. City of Arlington*, 219 S.W.3d 401 (Tex. App. 2nd Dist. 2006) is persuasive. In *Pakdimounivong*, a citizen named Vattana was arrested and placed into a police cruiser, but Vattana kicked out the window of the cruiser before it left the scene. *Id*. at 405. Vattana was then restrained in a second cruiser driven by an Officer Haven. *Id*. at 405-406. Officer Haven was transporting Vattana to jail when Vattana shattered the cruiser window by banging his head against it and kicking it, and within a matter of seconds jumped out of the cruiser. *Id*. at 406-407. Vattana was immediately run over by two other police cruisers, and his injuries were fatal. *Id*.

The trial court found that the City of Arlington was entitled to sovereign immunity because a statutory exception for injury caused by the operation of a motor vehicle was not applicable. *Id*. The appellate court affirmed, reasoning that "[t]he car driven by Officer Haven did not strike Vattana, but was the one from which Vattana escaped and then jumped into the middle of traffic on the highway." *Id*. "The motor vehicle driven by Officer Haven did no more than furnish the condition that made injury possible to [Vattana]." *Id*. Thus, "Vattana's personal injury and subsequent death did not arise from the operation or use of this motor vehicle." *Id*.

As in *Pakdimounivong*, the facts in this case cannot establish that Officer Magill's operation of his cruiser was negligent. Instead, Officer Magill was merely driving the cruiser from which English escaped before he chose to commit suicide.

In any event, Plaintiff concedes that Officer Magill was involved in an emergency call under § 2744.02(B)(1)(a) when transporting English to the jail. (Doc. 52 at 16.) As a result, the City of Dayton is not subject to liability unless Plaintiff could show that Officer Magill's operation

of his vehicle constituted willful or wanton misconduct.  Ohio Rev. Code § 2744.02(B)(1)(a).

"Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of

conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully

doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury."

*Gilbert v. Cleveland*, 2013-Ohio-5317, ¶ 15.   No reasonable juror could find that this high

standard is met in this case.

As the City of Dayton is immune from liability under Ohio Revised Code § 2744.02(A)(1),

Plaintiff's state law claims against the City of Dayton are dismissed.

### 2.   Officer Magill's Immunity Under Ohio Rev. Code § 2744.03(A)(6)

Under The Political Subdivision Tort Liability Act, Officer Magill is also immune from

liability on Plaintiff's state law claims, unless: (a) "the employee's acts or omissions were

manifestly outside the scope of the employee's employment and official responsibilities;" (b) "the

employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless

manner;" or (c) "civil liability is expressly imposed upon the employee by a Section of the Revised

Code."   Ohio Rev. Code § 2744.03(A)(6).   As discussed below, Officer Magill is entitled to

immunity because none of these exceptions apply.

As to the Ohio custodial negligence claim, Plaintiff concedes that Officer Magill is entitled

to immunity unless his conduct was "reckless" under Ohio law.   (Doc. 52 at 14.)   The Supreme

Court of Ohio has described reckless conduct as "characterized by the conscious disregard of or

indifference to a known or obvious risk of harm to another that is unreasonable under the

circumstances and is substantially greater than negligent conduct."   *Anderson v. City of

Massillon*, 134 Ohio St. 3d 380 at syllabus (2012).   Plaintiff has failed to identify any facts from

22

which a reasonable juror could find that Officer Magill recklessly operated his police cruiser or otherwise acted recklessly during the events at issue. Officer Magill is entitled to summary judgment on the Ohio custodial negligence claim.

The only other state law claim against Officer Magill is the survivorship claim. Plaintiff's assertion that Defendants "did not make any motion regarding the Ohio survival claim" is incorrect. (Doc. 52 at 18.) Defendants argued that they were entitled to immunity on all of Plaintiff's state law claims (Doc. 45 at 22, 30) and, specifically as to Officer Magill, that "Plaintiff's claims for custodial negligence and survivorship against Officer Magill are negligence-based claims in name and substance, and do not rise to malicious, bad faith, wanton, or reckless conduct, so Officer Magill is immune on those claims" (*id.* at 30). Defendants' argument, which is effectively unopposed, has merit. Negligence is insufficient to overcome Officer Magill's immunity under § 2744.03(A)(6), and there are no facts that could reasonably support a finding that Officer Magill acted recklessly. Officer Magill is entitled to summary judgment on Plaintiff's survivorship claim.

## IV. CONCLUSION

Defendants' Motion for Summary Judgment is **GRANTED**. The Clerk is ordered to **TERMINATE** this case on the Court's docket.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, May 2, 2016.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE